IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 12, 2006

## STATE OF TENNESSEE v. MARIO L. SMITH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2004-C-2264     Seth Norman, Judge**

---

**No. M2006-00402-CCA-R3-CD - Filed Janaury 29, 2007**

---

The defendant, Mario L. Smith, was convicted by a Davidson County Criminal Court jury of attempted second degree murder, a Class B felony, and vandalism over $1000, a Class D felony, and was sentenced by the trial court as a Range I, standard offender to concurrent sentences of nine years and two years, respectively, in the Department of Correction. The sole issue the defendant raises on appeal is whether the evidence was sufficient to sustain his attempted second degree murder conviction. We conclude that the evidence was sufficient to sustain the conviction and, accordingly, affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

William A. Lane, Murfreesboro, Tennessee, for the appellant, Mario L. Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Dan Hamm and Sharon Reddick, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On August 24, 2004, the Davidson County Grand Jury indicted the defendant on one count of attempted first degree murder and one count of vandalism over $1000 based on his role in two shooting incidents that occurred on June 4, 2004, in North Nashville. In the first incident, a pedestrian was walking down the street when the backseat passengers of an approaching vehicle opened fire on him. In the second incident, which occurred in the same neighborhood moments later, passengers of the same vehicle fired shotgun blasts into an unoccupied Ford Mustang that was parked on the street.

Jeremy Owens,[1] the victim of the attempted murder, testified at the defendant's trial that on June 4, 2004, he was walking down the sidewalk on Sixth Avenue toward Buchanan Street when he saw a small dark car coming toward him. As he looked toward the vehicle, the driver's side rear window lowered and a juvenile he recognized, Kelando Webster, fired a gunshot that struck him in the leg. Webster got out of the vehicle from the driver's side rear door, followed by the defendant, who exited from the passenger's side rear door. As Owens fled, both men fired several shots at him. Owens said he heard the sound of the defendant's gun being cocked and believed that it was a rifle. He also said that he distinctly heard the sounds of two different guns being fired at him as he fled from the area.

Owens testified that he ran between two buildings, down an alley, and into a neighbor's home where he telephoned the police. He made a positive courtroom identification of the defendant as the adult who had shot at him and testified that he and the defendant had known each other since they were in the fifth grade, or approximately ten years. Owens stated that he was unarmed when the incident occurred and that he received a gunshot wound to his knee from a bullet which passed completely through his leg. On cross-examination, he acknowledged that he was not hit by any shotgun pellets. He further acknowledged that he had been convicted in 2003 for selling drugs and possessing a gun.

Jesse Lee Woodson, Jr., testified that he was returning home from work at approximately 12:00 p.m. on June 4, 2004, when he heard gunshots and saw Owens, whose mother lived in his neighborhood, running down the street and then hiding behind the next apartment. He said that when Owens told him what was happening, he invited Owens into his apartment, wrapped his bleeding leg with a towel, and instructed him to call the police. In the meantime, he stood at his apartment door and saw a small, dark-colored car move slowly down the street, stop, and then take off again.

Carlos Milam testified that on June 4, 2004, he lived at 1816 Fourth Avenue North, Apartment B, and drove a 1999 red Ford Mustang. Sometime between 11:00 a.m. and 12:00 p.m. that day, he and his girlfriend heard gunshots, looked out the window, and saw the defendant standing outside a black car with tinted windows and shooting a long gun at Milam's Ford Mustang, which was parked in front of his apartment. The defendant then got back in the vehicle and the vehicle pulled off. Milam testified that he did not know the defendant prior to the incident but was able to identify him later that same day after the police had stopped the occupants of the black vehicle. He also made a positive courtroom identification of the defendant as the man he had seen shooting at his Mustang. He estimated that the defendant caused over $3500 in damage to his Mustang.

Anthony Ashley testified that he was painting a house on Fourth Avenue on June 4, 2004, when he heard multiple gunshots in the distance. A few seconds later, he heard gunfire two doors

---

[1]This witness testified that his name was Jeremy Alan North. However, the prosecutor and defense counsel addressed him as "Mr. Owens," and his name is listed as "Jeremy Owens" throughout the trial transcript.

down, looked out, and saw two men, one of whom was armed with a shotgun, shooting from a compact black car at a red Mustang on the street. Ashley identified the defendant in the courtroom as the man who had been armed with the shotgun.

Fourteen-year-old Shatika Clay testified that on June 4, 2004, her cousin, Terry Stuart, came to her home to borrow her father's black car. She said she rode in the front passenger seat as he drove to pick up Kelando Webster, whom she knew as "Key Key"; Terrance Demoss, whom she knew as "T"; and the defendant, whom she knew as "Mario." She stated that when they picked up the defendant at his home, he placed a long object wrapped in a sheet, which she later learned was a long gun, in the trunk before getting into the rear seat of the vehicle with Webster and Demoss. Inside the vehicle, the men discussed driving to "Salem Town," an area near the water company around Fourth Avenue and Buchanan Street. Clay said that she did not know why the men wanted to go to "Salem Town," but agreed that they had enemies who lived in that area.

Clay testified that the defendant took his gun out of the trunk at some point prior to their arrival in "Salem Town." She said she believed that they drove first to Fourth Avenue where the defendant got out, "shot up" the red Mustang, and then got back into their vehicle. They then drove to Sixth Avenue where they saw Jeremy Owens, or "Worm," walking down the street. Clay said that she did not know the victim prior to the incident but heard the men in her vehicle mention his name. She stated that she ducked her head down as the defendant, using his long gun, and Webster, using what she guessed was a smaller gun, fired several times at the victim. Afterwards, Stuart drove to his home where he and the defendant, who was carrying the long gun, got out of the vehicle, went inside, and returned several minutes later without the gun. Because Webster realized he had lost his cell phone, the group next returned to the Fourth Avenue location where the red Mustang was parked. However, when Stuart saw the police, he began backing up, struck another car, and then pulled over.

On cross-examination, Clay acknowledged that, although she saw the defendant shoot at the Mustang, she did not actually witness either him or Webster shoot at the victim because she had her head down at the time. She said she did not recall having told the police in her original statement that Webster was the only person she saw shoot the victim.

Metro Police Officer Tim Matthews testified that he recovered two spent .12 gauge shotgun shells from the street at the corner of Sixth Avenue and Buchanan Street and three .12 gauge shotgun shells, a .32 caliber cartridge, a .32 caliber cartridge casing, and a cell phone from the street at 1816 Fourth Avenue North where the Ford Mustang was parked. He said that three shotgun blasts had been fired at the Ford Mustang: two into the driver's side window and one into the driver's door. Officer Matthews testified that he also collected an H and R .32 caliber revolver, which had been found in the front yard of a vacant house on the corner, approximately half a block from the Ford Mustang. On cross-examination, Officer Matthews acknowledged that he did not conduct any gunshot residue tests on the suspects arrested in the case and did not process the recovered shells for fingerprints.

Metro Officer Ernest Cecil testified that he was at the Fourth Avenue location talking with the owner of the Ford Mustang and his girlfriend when a black, four-door vehicle drove by and the girlfriend said, "[T]here they go right there." In response, he and some of his fellow officers pursued and stopped the vehicle, a four-door, dark-colored Geo Prism containing four men and one woman. Officer Cecil stated that Stuart was the driver of the vehicle and the defendant, whom he identified in the courtroom, was one of three backseat passengers. He said that he later recovered a .12 gauge shotgun and .12 gauge shotgun shells from Stuart's bedroom closet at Stuart's mother's residence.

Detective Robert Swisher of the Metro Police Department, the lead detective assigned to the case, testified that he ultimately charged two individuals in connection with the shooting: Kelando Webster, who was charged in juvenile court, and the defendant. He said he personally interviewed the occupants of the black vehicle and, from one of those interviews, obtained the information that led to the recovery of the shotgun from Stuart's home. He acknowledged that no fingerprint analysis or ballistics testing had been performed on the weapon. He explained, however, that all of the information he had received indicated that the defendant was the only person who had handled the shotgun at the crime scenes.

The defendant, testifying in his own behalf, provided the following account of the shootings. During the two weeks that had elapsed since his and Stuart's graduation, Stuart had regularly picked him up from his home each morning so that the two could spend the day "hanging out." When Stuart arrived on the morning of June 4, he had his cousin, Shatika Clay, in the front passenger seat of his vehicle and Kelando Webster and Terrance Demoss in the backseat. Demoss showed the defendant the shotgun as the defendant got into the backseat and told the defendant that he was taking the gun home. En route to Stuart's house, Stuart asked the defendant if he wanted to ride to "Salem Town." He answered that he did not care but then suggested that they first drop off the gun. Stuart, however, replied that they were only going to ride through the area.

The defendant testified that they were driving down Sixth Avenue when they passed a group of men and then saw the victim and his brother crossing the street. Upon seeing the victim, Webster said, "[T]here goes the nigger that been trying to kill us," lowered his window, fired two shots, and began exiting the vehicle. At that point, the crowd of men started toward their vehicle and the defendant, in order to protect himself and his friends, grabbed the shotgun and fired twice into the air. The defendant claimed that he never aimed the shotgun at anyone and fired only so that he and his friends could escape the area. He described the incident:

> The car was in a stop, he [Webster] was getting out of the car. It was a lot of people coming towards the car, so I grabbed the shotgun and shot once in the air. Then went on the other side of the car, I never pointed my gun at nobody. The gun that I had used that was in the car I never pointed at nobody. I shot again because his [the victim's] brother was coming towards us. At that point I ran back in the, I ran and got in the car. As we ran and got in the car I told [Stuart], get us out of here.

The defendant testified that they were leaving the area when he saw the red Mustang on Fourth Avenue. He said he told Stuart to stop because "that was the dude who set [them] up," got out of the car, "let shots up off in [the Mustang]," and then got back in the car. Stuart then drove them to Stuart's home, where Stuart deposited the shotgun. The defendant said he wanted to go home at that point, but Webster, who had realized he had lost his cell phone, asked that the others accompany him back to the area around the Mustang to search for it. Because Webster was his friend, he agreed and the group returned to the area, where they were surrounded by the police. The defendant denied that he and his friends discussed shooting the victim before the incident transpired. He volunteered, however, that the victim and his friends had been shooting at him and his friends "for over two months." On cross-examination, the defendant testified that the victim and his friends had shot at him five to seven times but acknowledged that he had never reported the shootings to the police. He further acknowledged that, to his knowledge, the victim was unarmed on June 4, 2004.

## ANALYSIS

### Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence in support of his attempted second degree murder conviction. In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted

defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a) (2003 & 2006). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]" Id. § 39-11-106(a)(20) (2003 & 2006). Criminal attempt is defined as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (2003 & 2006).

In arguing that the evidence was insufficient to sustain his conviction, the defendant points out that Clay acknowledged she had her head down during the shooting and that the victim never testified that he saw the defendant aiming the shotgun at him. However, when viewed in the light most favorable to the State, the evidence was more than sufficient for the jury to find the defendant guilty of the attempted second degree murder of the victim. After being shot by Webster, the victim saw both Webster and the defendant get out of the rear seat of the vehicle. He said that each was armed and that he heard the distinct sound of two different guns being fired at him as he fled from the scene. Clay saw the defendant load the shotgun in the trunk of the vehicle when he joined the group, take it out of the trunk prior to their arrival at the shooting location, and have it in his possession when the group spotted the victim walking down the street. She testified that the men discussed driving to "Salem Town" and acknowledged that they had enemies who lived there. Notably, she said nothing about a crowd of men having approached or threatened their vehicle before, during, or after the shooting. The defendant volunteered at trial that the victim and his friends had been shooting at him before the incident, thus offering a motive for why he might have

wanted to kill the victim. We conclude, therefore, that the evidence was sufficient to sustain the defendant's attempted second degree murder conviction.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE